Case 3:24-mj-00849-RMS   Document 1-1   Filed 09/20/24   Page 1 of 13

United States District Court
District of Connecticut
FILED AT NEW HAVEN

9/20 ,20 24

By  N. Langello
Deputy Clerk

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

IN RE SEARCH OF
TARGET LOCATION 5

Case No. 3:24-mj-849 RMS

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

I, Andrew Pfeiffer, a Task Force Officer with the Drug Enforcement Administration being first duly sworn, hereby depose and state as follows:

**AGENT BACKGROUND**

1. I am a member of the Hamden Police Department in the capacity of a sworn police officer and have been employed as a certified police officer in the State of Connecticut since 2012. I am assigned to the Hamden Police Department Street Interdiction Team and am currently assigned as a Task Force Officer (TFO) for the Drug Enforcement Administration (DEA), New Haven District Office (NHDO)-Tactical Diversion Squad (TDS) and have been so assigned since 2019. My duties include investigating violations of the Connecticut General Statutes and the federal Controlled Substances Act, including but not limited to the diversion of controlled substances from legitimate medical channels.

2. As a law enforcement officer, I have conducted numerous investigations of violations of the law, which have led to arrests and convictions. I have coordinated controlled purchases of illegal drugs using confidential sources and cooperating witnesses. I have planned and participated in the execution of state and federal search warrants pertaining to individuals involved in the distribution of controlled substances, conducted electronic surveillance and physical surveillance of individuals involved in the distribution of controlled substances, analyzed records documenting the purchase and sale of illegal drugs, and spoken with informants and subjects, as well as other local,

state, and federal law enforcement officers, regarding the manner in which narcotics traffickers obtain, finance, store, manufacture, transport, and distribute illegal drugs.

3.  I am a case agent investigating KELLDON HINTON and others for manufacturing and distributing controlled substances, including counterfeit pills, in the area of New Haven and beyond.  Specifically, on September 5, 2024, KELLDON HINTON, HESHIMA HARRIS, EMANUEL PAYTON, SHAWN STEPHENS, and ARNALDO ECHEVARRIA were arrested, based upon a criminal complaint issued by this Court on September 4, 2024.  HINTON was charged with Conspiracy to Manufacture, Distribute, and Possess with the Intent to Distribute Controlled Substances, including 50 Grams or More of a Mixture and Substance Containing a Detectable Amount of Methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(B)(viii), (b)(1)(C), and 846, and HARRIS, PAYTON, STEPHENS, and ECHEVARRIA were charged with Conspiracy Manufacture, Distribute, and Possess with the Intent to Distribute Controlled Substances in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C) and 846).

4.  On September 18, 2024, a grand jury sitting in Bridgeport, Connecticut, returned a three-count Indictment charging the same individuals with drug trafficking offenses.  Specifically, HINTON was charged with Conspiracy Possess with the Intent to Distribute Controlled Substances, including 50 Grams or More of a Mixture and Substance Containing a Detectable Amount of Methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(B)(viii), (b)(1)(C), and 846, and with Possession with Intent to Distribute Controlled Substances, including 50 Grams or More of a Mixture and Substance Containing a Detectable Amount of Methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B)(viii).  HARRIS, PAYTON, and STEPHENS, along with two new defendants, MARVIN

OGMAN and CHERYL TYSON, were similarly charged with Conspiracy to Manufacture, Distribute, and Possess with the Intent to Distribute Controlled Substances in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), and 846.  ECHEVARRIA was charged as part of the conspiracy with HARRIS, PAYTON, STEPHENS, OGMAN, and TYSON and also with Possession with Intent to Distribute Controlled Substances in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C) (collectively, the "Charged Offenses").

## PURPOSE OF THE AFFIDAVIT

I submit this affidavit in support of an application under Rule 41 of the Federal Rules of Civil Procedure to search Storage unit A3 located at 237 Saw Mill Road in West Haven, CT operated by Metro Self Storage ("**TARGET LOCATION 5**"), further described in Attachment A, for evidence of the Charged Offenses and for contraband, fruits of crime, and property used in committing the Charged Offenses, as set forth more particularly in Attachment B, including but not limited to quantities of controlled substances, drug paraphernalia, drug packaging materials, cash deriving from the sale of drugs, bank records, business receipts, and invoices and/or documents and records relating to the Charged Offenses, including records stored in electronic form.  Based on the information set forth in this affidavit, I believe there is probable cause to believe that TARGET LOCATION 5 contains evidence of the Charged Offenses.

## PROBABLE CAUSE

5. On September 5, 2024, DEA Task Force Officer Andrew Pfeiffer signed an affidavit in support of search warrants for 34 Tyler Street Extension, East Haven, CT ("Target Location 1") and 55 Dewitt Street, New Haven, CT ("Target Location 2"); and one 2023 Gray Chevy Malibu bearing NY marker plate LJX9536 ("Target Vehicle 1") being used by HINTON in furtherance of the Charged Offenses, and in support of arrest warrants for HINTON, HARRIS, PAYTON,

3

STEPHENS and ECHEVARRIA for the Charged Offenses. A copy of that affidavit (hereinafter, the "Original Affidavit") has been attached as Attachment C and incorporated herein.

6.  On September 17, 2024, DEA Task Force Officer Andrew Pfeiffer signed an affidavit in support of search warrants for several cell phones located in the possession of HINTON at the time of his arrest, including one gray "Samsung" smartphone (DEA Exhibit N-39) with cell phone number (475) 355-0907 (the "HINTON TELEPHONE"). A copy of that affidavit (hereinafter, the "Device Affidavit") has been attached as Attachment D and incorporated herein. On that same date, the Honorable Robert M. Spector authorized the search of those cell phones, which as to Exhibit N-39 commenced shortly thereafter. *See* In re Search Warrant, No. 3:24-MJ-837 (RMS).

7.  On September 18, 2024, DEA Task Force Officer Andrew Pfeiffer signed an affidavit in support of a warrant to search storage unit B8 at 237 Saw Mill Road in West Haven, CT operated by Metro Self Storge. A copy of that affidavit (hereinafter the "Storage Locker Affidavit") has been attached as Attachment E and incorporated herein. On that same date, the Honorable Robert M. Spector authorized the search of that location, the search of which commenced shortly thereafter. The storage unit was empty.

### *HINTON's Use of Storage Facilities*

8.  As set forth in the Storage Locker Affidavit, investigators learned as it began the search of the HINTON TELEPHONE, that HINTON had contacted Metro Self Storage ("Metro") in West Haven, CT in August 2024 and subsequently directed an associate the procure that space for him, which the associate did, shortly thereafter. Messages from the HINTON TELEPHONE further revealed that prior to securing that storage space, HINTON had advised coconspirator Emanuel PAYTON that storage facilities were a safe place to store money.

9. Also in the Storage Locker Affidavit, I described video obtained from the HINTON TELEPHONE of HINTON in a large room consistent with a storage unit or garage. The video appears to have been recorded in Summer 2024. He can be heard stating that this location could be "Location 3." A preliminary review of the records obtained from the phone suggest that HINTON sent this video to HARRIS, PAYTON and other associated with HINTON's drug distribution network. *See* Storage Locker Affidavit ¶ 13. Based on my knowledge of this investigation, I believe that when HINTON refers to "Location 3," he is directly referencing the fact that he and his coconspirators are already operating two locations to manufacture, store, and sell counterfeit pills with the HINTON DTO and that in the Summer of 2024 he was looking for a third location. At the time of HINTON's arrest, investigators had positively identified one location—HINTON's 34 Tyler Street Extension garage laboratory ("Target Location 1")—as one of those three locations. As a result, I believe that two additional locations are likely being used to further the HINTON DTO's activities.

### *Identification of Metro Storage Unit A3 ("TARGET LOCATION 5")*

10. As set forth above, on September 18, 2024, a federal search warrant was issued to search storage locker B8 maintained by HINTON at 237 Saw Mill Road in West Haven, CT operated by Metro Self Storge. That storage was searched and found to be empty.

11. However, during the continued search of the HINTON TELEPHONE, investigators located a video with a listed date and time of April 1, 2024 3:58 p.m. that shows HINTON pulling up to the gate of Metro Storage at which point the gate display appears to read, "Thank you Michael" which investigators understand would be HINTON accessing the facility with a code assigned to an individual named Michael. The exterior garage door then appears to open and a swing gate also

opens. Based on a review of the video, agents were able to identify this particular gate as leading to the "A" units within the Metro Storage complex.

12. A second video, with a listed date and time of April 1, 2024 at approximately 4:09 p.m. shows HINTON inside of what appears to be a storage unit, opening a large, Rubbermaid Roughneck Heavy Duty storage bin filled to the top with gallon-size Ziploc-style plastic bags containing pressed pills. The unit appears to contain at least fifteen of these large Rubbermaid bins. The Ziploc-style baggies inside of the bin that HINTON opens and can be viewed on camera have writing on them that appear to reflect the type of counterfeit pills. For example, a container labeled "5" is opened by HINTON and appears to contain thousands of round, blue pills in gallon size Ziplock bags with a further label of "Perc 5mg," which I believe based on my training and experience are counterfeit Percocet 5mg pills. Equally important, the storage bins of counterfeit pills observed in this video appear to be a different color and size from the bins containing counterfeit pills located during the search of HINTON's 34 Tyler Street Extension on September 5, 2024, further leading investigators to believe that the bins in the video were not seized during the search of HINTON's Tyler Street Extension garage laboratory and that HINTON has been maintaining at least one separate stash of counterfeit pills outside of his pill pressing location.

13. I further believe, based on the evidence below, that the particular unit being used by HINTON is Unit A3 (**TARGET LOCATION 5**) and that HINTON continues to maintain the unit beyond his September 5, 2024 arrest to maintain additional quantities of counterfeit pills.

14. First, in the HINTON TELEPHONE, investigators located a selfie-style photo of HINTON and STEPHENS posing within Section A of the Metro Storage facility, directly across from **TARGET LOCATION 5**. Although the image is not dated, investigators first began observing STEPHENS with HINTON at HINTON's 34 Tyler Street Extension garage laboratory in

mid-summer of 2024 and mailing packages on behalf of HINTON's dark web counterfeit pill business in August 2024. Accordingly, there is probable cause to believe that the photo was taken within one or two months leading up to HINTON's and STEPHENS' September 5, 2024 arrest. Moreover, based on the presence of STEPHENS in the photo, who appeared to be a trusted associate of HINTON and permitted to work closely with HINTON at the 34 Tyler Street Extension garage laboratory, there is probable cause to believe that the storage locker within Section A of the Metro Storage facility was also being used to carry on HINTON's counterfeit pill pressing operation.

15. Second, after HINTON's arrest on September 5, 2024, he was detained at Wyatt Detention Center. Investigators obtained recorded calls made by HINTON following his arrest, including several to a paramour, identified herein as K.B. In one call, HINTON instructs K.B. to get in touch with "Mike" to pay the bill, adding "you understand what I'm talking about," which I believe is HINTON attempting to avoid talking on a recorded line explicitly about illicit activity, here, the continued maintenance of counterfeit pills at other locations. In a later call, K.B. indicates that she has spoken to "Mike." Based on the earlier video in which HINTON appears to access Section A of the Metro Storage facility using the name "Michael," investigators believe that the reference to needing to have "Mike" pay the bill relates to a bill for the storage unit.

16. In an effort to identify "Mike," investigators compared registration information for storage units in Section A of the facility provided by Metro Storage against contact information in the HINTON TELEPHONE. Investigators were able to locate a matching contact. In the records from Metro Storage, an individual named "Michael Ross" is assigned unit "A3" (**TARGET LOCATION 5**). The HINTON TELEPHONE also contains a contact for "Michael Ross" with phone number (203) 824-2263 (the "Ross Telephone"). Toll records for the Ross Telephone show that the Ross Telephone was in communication with Metro Storage on September 7, 2024, two days

after HINTON's arrest, confirming for investigators that the "Michael Ross" who is renting storage unit "A3" is the same Michael Ross in HINTON's phone and the same "Mike" who HINTON asked K.B. to contact after his arrest to ensure the bill for the storage unit was paid.

17. In addition, toll records for another one of HINTON's phones, which was also used in furtherance of the Charged Offenses with a phone number (475) 301-3656, shows that HINTON was in periodic contact with the Ross Telephone starting in May 2023 through August 23, 2024, including two calls on March 30, 2024, the day before HINTON's April 1, 2024 video-documented visit to Section A of Metro Storage to check on his stash of hundreds of thousands of counterfeit pills at that location.

18. Moreover, Metro Storage records reflect that Michael Ross began renting **TARGET LOCATION 5** on October 20, 2021. Images obtained by the U.S. Postal Inspection Service during its controlled purchase of counterfeit Adderall pills from HINTON's dark web vendor page in late 2023 include product images that include labeling reflecting that the pills had been available for sale starting in or around November 7, 2021, only a few weeks after **TARGET LOCATION 5** had been secured. The timing of the renting of **TARGET LOCATION 5**, only a few weeks before HINTON appears to begin advertising his pills for sale on his dark web vendor site supports investigators' belief that the purpose of obtaining **TARGET LOCATION 5** was to maintain additional quantities of counterfeit pills needed to fulfill orders taken by HINTON from his dark web marketplace.

19. Finally, on September 20, 2024, the landlord of Metro Storage provided consent to DEA investigators to conduct an open-air dog sniff within the common area of Section A of the Metro Storage facility outside of **TARGET LOCATION 5**. That same day, the common area outside of **TARGET LOCATION 5** was examined by a trained narcotics detection canine. The canine is a four (4) year-old tan Labrador Retriever named Hanny. Hanny is assigned to Officer

Brandon Butler of the West Haven, CT Police Department. Hanny was first certified in May of 2022 and was last recertified in October 2023. Hanny is certified in the detection of cocaine, crack cocaine, heroin, MDMA and methamphetamines. Hanny receives weekly in-service training sessions in the detection of narcotics. Officer Butler and Hanny also train daily on all of the odors that Hanny is trained to detect. Upon examination of the common area outside of **TARGET LOCATION 5**, the canine handler informed DEA investigators that the canine did not alert for a positive narcotic odor. I know based on my training and experience, narcotics traffickers use plastic bins and heavy ziplock bags to obscure the odor permeating narcotics, and further I know based on the interior of the structure, that as a climate-controlled facility with open tops, odor from the storage units can be easily dissipated within the overall facility which could make detection by a canine difficult.

20. For these reasons and based on the evidence set forth above, including HINTON's video and photo documentation that he has been maintaining bulk quantities of counterfeit pills in a unit within Section A of Metro's facility, the identification of the renter of **TARGET LOCATION 5** who was in communication with HINTON during the period in which HINTON engaged in the Charged Offenses, and the attempts by HINTON to ensure that the renter of **TARGET LOCATION 5** continues to pay the bill for the storage location following his arrest on September 5, 2024, there is probable cause to believe and I do believe that HINTON continues to maintain **TARGET LOCATION 5** for the purpose of stashing additional quantities of counterfeit pills that were not originally seized during the search of his 34 Tyler Street Extension garage laboratory on September 5, 2024, and that evidence of the Charged Offenses will be found in **TARGET LOCATION 5**.

21. I further request authorization to search **TARGET LOCATION 5** any time day or night. The bases for this request include that **TARGET LOCATION 5** is a long-term storage facility and not a residence where individuals are believed to be living or sleeping during nighttime

hours. In addition, evidence that HINTON made calls inquiring about the storage location to K.B. following his arrest leads investigators to believe that HINTON might eventually attempt to have associates access and move the contents of the unit. Finally, given the volume of suspected counterfeit pills observed in HINTON's April 1, 2024 video within the storage unit, investigators' knowledge of the dangerous nature of those counterfeit pills, and the belief that **TARGET LOCATION 5** continues to contain a quantity of those counterfeit pills, a search authorized outside of the hours of 6:00 a.m. to 10:00 p.m. is necessary to ensure the immediate safety of the community, including but not limited to other storage unit renters, property maintained in other units, and maintenance staff.

## CONCLUSION

22. Based on this information set forth in this affidavit as well as the Original Affidavit, the Device Affidavit, and the Storage Locker Affidavit, I respectfully submit that there is probable cause to believe that **TARGET LOCATION 5** contains evidence of the Charged Offenses.

Respectfully submitted,

ANDREW PFEIFFER (Affiliate)
Digitally signed by ANDREW PFEIFFER (Affiliate)
Date: 2024.09.20 21:31:37 -04'00'

Andrew Pfeiffer
Task Force Office
Drug Enforcement Administration

The truth of the foregoing affidavit has been attested to me over the telephone by TFO Andrew Pfeiffer over the telephone on this 20th day of September, 2024.

Robert M. Spector
Digitally signed by Robert M. Spector
Date: 2024.09.20 21:59:35 -04'00'

HONORABLE ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

**Property to be Searched**

Storage unit A3 located at 237 Saw Mill Road in West Haven, CT operated by Metro Self Storage

## ATTACHMENT B

### Particular Things to be Seized

The following items evidencing violations of Conspiracy Manufacture, Distribute, and Possess with the Intent to Distribute Controlled Substances in violation of Title 21, United States Code, Sections 841(a)(1) and 846) (collectively, the "Charged Offenses"):

1. Any controlled substance (all of which could be in any form) and items containing residue of controlled substances;

2. Paraphernalia used and commonly associated with the possession and distribution of controlled substances, including, but not limited to: scales, packaging materials, including plastic baggies, plastic or glass vials, heat sealing machines, pipes, grinders, funnels, presses, pill punches/dies, sifting screens and/or strainers, and any materials used for "cutting" or diluting controlled substances;

3. Any books, records, receipts, notes, ledgers, journals, travel documents, and other papers relating to the purchase and distribution of controlled substances;

4. Bank statements, tax records, financial statements and records, safe deposit keys, storage unit keys, receipts, and other books and records, including any related to the purchase of real property and personal property (including automobiles), and, in general, any records or documents evidencing the obtaining, transfer, concealment, or expenditure of money or other assets, and/or demonstrating the use of monies generated by the sale of controlled substances.

5. United States currency, stocks, bonds, certificates of deposit, any other financial instruments, money counters, and the contents of any safes or other security type boxes or locked boxes and containers, including any jewelry, precious metals and gems, such as gold, silver and diamonds evidencing the obtaining, transfer, concealment, or expenditure of money or other assets, and/or demonstrating the laundering or use of monies generated by the sale of controlled substances;

6. Business receipts, invoices, records of accounts payable and receivable, and general ledgers;

7. Identification documents and keys evidencing a possessory interest in premises, vehicles and storage containers;

8. Records relating to ownership, occupancy, or use of the Target Premises (such as utility bills, phone bills, rent payments, mortgage payments, photographs, insurance documentation, receipts and check registers);

9. Records relating to the operation or ownership of any computer hardware, software, storage media, or data (such as user names, passwords, telephone records, notes, books, diaries, and reference materials);

10. Records pertaining to accounts held with companies providing Internet access or remote storage of either data or storage media;

11. All computer equipment and peripherals that may be interdependent, the software to operate the computer system, related instruction manuals that contain directions concerning the operation of the computer system, the software programs, and all electronically stored or computerized computer data; any physical keys, encryption devices, dongles, passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data;

12. Any computer equipment or digital devices that are capable of being used to commit or further the crimes referenced above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes, including central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices including paging devices and cellular telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communication devices such as modems, routers, cables, and connections; storage media; and security devices;

13. Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, and cell phones capable of being used to commit or further the crimes referenced above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes;

14. Any computer equipment or digital devices used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing, equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners that are capable of being used to commit or further the crimes referenced above, or to create, access, process, or store evidence, contraband, fruits, or instrumentalities of such crimes;

15. All passwords, passphrases, encryption keys, encryption dongles, and/or any information, including tools, records, and techniques used to activate and/or navigate and access in plain-text data stored in encrypted data systems, encrypted filesystems, encrypted files, and encrypted records or documents;

16. All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show the actual user(s) of the computers or digital devices during the time the device was used to commit the crimes referenced above, including the web browser's history; temporary Internet files; cookies, bookmarked, or favorite web pages; email addresses used from the computer; MAC IDs and/or Internet Protocol addresses used by the computer; email, instant messages, and other electronic communications; address books; contact lists; records of social networking and online service usage; and software that would allow others to control the digital device such as viruses, Trojan horses, and other forms of malicious software;

17. Records of any communications relating to drug trafficking; and

18. Firearms and ammunition.